Opinion for the Court filed by Circuit Judge SENTELLE.
Dissenting opinion filed by Circuit Judge ROGERS.
SENTELLE, Circuit Judge:
Community and environmental groups petition for review of agreements between EPA and animal feeding operations. The agreements are designed to bring the facilities into compliance with the permitting and reporting requirements of three environmental statutes. Petitioners argue that the agreements are rules disguised as enforcement actions, that EPA did not follow proper procedures for rulemaking, and that EPA exceeded its statutory authority by entering into the agreements. We hold that the agreements do not constitute rules, but rather enforcement actions within EPA’s statutory authority. We dismiss the petitions for review because exercises of EPA’s enforcement discretion are not reviewable by this court.
I.
Animal feeding operations (“AFOs”) are facilities where animals are raised for eggs, dairy, or slaughter. See 40 C.F.R. § 122.23(b)(1). At issue in this case are AFOs producing eggs, broiler chickens, turkeys, dairy, and swine. In the course of their operations, AFOs emit a number of pollutants regulated by the Clean Air Act, 42 U.S.C. § 7401 et seq., the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. (“CERCLA”), and the Emergency Planning and Community Right>-to-Know Act, 42 U.S.C. § 11001 et seq. (“EPCRA”) (collectively, the “Acts”). The pollutants — ammonia, hydrogen sulfide, particulate matter, and volatile organic compounds — emanate from animal housing structures and areas used to store and treat manure. Animal Feeding Operations Consent Agreement and Final Order, Notice, 70 Fed.Reg. 4958, 4959 (Jan. 31, 2005) (“Consent Agreement”). An AFO that releases these pollutants in sufficient quantities may be required to report them under CERCLA and EPCRA, and may be subject to various requirements under the Clean Air Act. Id. An AFO emitting these pollutants in quantities below the statutory thresholds, however, has no obligation under the Acts to obtain permits or report its emissions.
Petitioners are a number of community and environmental groups, some of whose members live near AFOs. They assert that the AFOs emit particulate pollution and terrible odors, and that they attract hordes of flies that leave their droppings on everything from cars to outdoor furniture. As a result, petitioners claim that their members suffer effects ranging from reduced enjoyment of the outdoor portion of their property to adverse health effects such as respiratory and heart problems. Additionally, as long as the AFOs’ emissions are not definitively determined to be above or below the statutory thresholds, petitioners’ members suffer from the uncertainty of not knowing whether the AFOs’ emissions exceed legal limits, and not knowing how their long-term health may be affected.
Because the Acts apply only to emissions above specified levels, EPA cannot *1029 enforce the statutory and regulatory requirements without determining an AFO’s emissions. Generally, an AFO emits these pollutants in proportion to its size: the more animals it houses, the more it pollutes. Precise measurements have eluded the government and the AFO industry, which are in agreement that there is no existing methodology to measure reliably an AFO’s emissions. Ad HoC Comm, on Air Emissions From Animal Feeding Operations et at., NAT’L RESEARCH C0UNCIL, AlR Emissions From ANimal Feeding Operations: Current Knowledge, Future Needs (2003), available at http: www.nap.edu/ catalogZ10586.html; Consent Agreement, 70 Fed.Reg. at 4958. The present uncertainty hampers EPA’s ability to enforce the requirements of the Clean Air Act, EPCRA, and CERCLA against AFOs. EPA’s solution to this problem was to invite AFOs to sign a consent agreement under which each AFO will assist in developing an emissions estimating methodology. Consent Agreement, 70 Fed.Reg. at 4958. In exchange, EPA will not pursue administrative actions and lawsuits against the AFOs for a defined period of time. Id. at 4959. In the agency’s judgment, this is the “quickest and most effective way” to achieve compliance. Id. at 4958.
EPA drafted the Consent Agreement in consultation with “representatives of state governments, environmental groups, local citizens’ groups, and the AFO industry.” Id. at 4961. On January 31, 2005, the agency published the final draft of the Agreement, invited interested AFOs to sign up, and sought public comment. Id. at 4958. After the comment period closed, EPA concluded that the “vast majority” of the comments received “were ones that had been previously expressed to EPA, and they had already been considered in the development of the Agreement.” Animal Feeding Operations Consent Agreement and Final Order, 70 Fed. Reg. 40,016, 40,017 (July 12, 2005) (“July 12 Notice”). To date, several thousand AFOs have signed Agreements. Once EPA signs the Agreements, they are forwarded to EPA’s Environmental Appeals Board (“EAB”) for approval. See 40 C.F.R. § 22.4(a)(1). The Agreements become enforceable against EPA once they are approved by the EAB in a final order. See id. §§ 22.18(b)(3), 22.4(a)(1). EAB has considered the Agreements in seven sets, and approved a total of 2,568 Agreements.
Although each participating AFO signs an individual Agreement with EPA, all the Agreéments have identical terms. Consent Agreement, 70 Fed.Reg. at 4962-68. The AFO, although not admitting any violation of the Acts, agrees to pay a civil penalty for potential violations based on the size and number of its farms. Id. at 4965-66. It agrees to help fund a nationwide study that will monitor, over a two-year period, emissions from animal housing structures and manure storage and treatment areas. Id. at 4959, 4966-67. The AFO also agrees to permit its facility to be monitored in the study upon request. Id. at 4959-60, 4967. The study, designed in consultation with industry and academia, aims to generate “a valid sample that is representative of the vast majority of the participating AFOs” by monitoring different types of AFOs in different geographic areas. Id. at 4960. As data from the study is received, EPA will use it along with existing emissions data to develop scientifically sound tables or models for AFOs to estimate their emissions. Id. at 4960. In consideration for the AFOs’ assistance, EPA agrees not to sue participating AFOs for certain potential past and ongoing violations of the Acts for the duration of the study. Id. at 4959, 4963-64. Within 120 days after EPA publishes the new methodologies, however, the AFO must initiate compliance efforts such as applying for a permit. Id. at 4964. EPA *1030 predicts that this schedule will result in compliance by participating AFOs within about four years from the start of the study. Id. at 4959-60.
Although the Agreement is intended to bring AFOs into eventual compliance with the Acts, petitioners argue that EPA lacks authority to achieve compliance in this manner. They believe that the AFOs should be forced to comply more quickly with the statutory requirements. They also argue that the procedures by which EPA entered into the Agreement did not afford them the meaningful opportunity for comment required by the Administrative Procedure Act, 5 U.S.C. § 551 et seq. (“APA”). Petitioners challenged the Agreement before the agency while it was being developed, and now identify ten agency actions that they contend should be vacated. Three are Federal Register notices: one announced the availability of the Agreement and solicited comments, Consent Agreement, 70 Fed.Reg. at 4958; another extended the period for sign-up and comment, Animal Feeding Operations Consent Agreement and Final Order, 70 Fed.Reg. 16,266 (Mar. 30, 2005); and the third published the agency’s responses to the comments, July 12 Notice, 70 Fed.Reg. at 40,016. The seven remaining agency actions challenged by petitioners are the EAB final orders approving batches of the Agreements dated January 27, 2006, April 17, 2006, May 5, 2006, July 19, 2006, August 7, 2006, August 17, 2006, and August 21, 2006.
In EPA’s view, the Agreement is not a rulemaking, but rather a valid exercise of the agency’s enforcement discretion. EPA also argues that even if the Agreement constitutes a rulemaking, the agency did not violate the notice and comment requirements of the APA.
II.
Our analysis of this case begins and ends with subject matter jurisdiction.[1] In this case, subject matter jurisdiction turns on whether the Agreement constitutes a rulemaking subject to APA review, or an enforcement proceeding initiated at the agency’s discretion and not reviewable by this court. Under the APA, this court may review final agency actions, including an agency’s promulgation of a rule. 5 U.S.C. §§ 701-706. Excluded from this court’s review, however, are agency actions that are “committed to agency discretion by law.” Id. § 701(a)(2). Enforcement actions are generally within this exclusion, because “a court would have no meaningful standai'd against which to judge the agency’s exercise of discretion” in deciding how to enforce the statutory provisions. Heckler v. Chaney, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).
Petitioners advance a number of arguments in support of their contention that the Agreement is a rule. They contend that the Agreement meets the definition of “rule” under the APA and that it does not fall within the definition of an enforcement action. They also argue that the Agreement must be a rule because EPA has bound its enforcement discretion, a factor that this court previously found significant in determining whether an agency action is a rule. Finally, petitioners contend that even if the Agreement is an enforcement action, the agency exceeded its enforcement authority when it exempted AFOs from statutory requirements.
EPA’s position that the Agreement is an exercise' of enforcement discretion rather than a rule is based on case law explaining the substantive difference between the two. In the agency’s view, the Agree *1031 ment’s purpose and effect are consistent with enforcement actions and inconsistent with rules. Moreover, EPA believes that the Agreement provides no exemption, but merely defers enforcement of certain statutory requirements in light of the agency’s judgment that immediate compliance is impossible or impracticable. We hold that the Agreement represents an enforcement action not subject to our review.
A.
Under Chaney, “an agency’s decision not to prosecute or enforce ... is a decision generally committed to an agency’s absolute discretion.” 470 U.S. at 831, 105 S.Ct. 1649. In that case, FDA rejected a citizen petition for the agency to take enforcement action against the use of drugs for lethal injection without approval for that use. Recognizing that “an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise,” the Supreme Court held that such decisions are presumptively unreviewable. Id. For example, “the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency’s overall policies, and, indeed, whether the agency has enough resources to undertake the action at all.” Id.
Although the Supreme Court’s decision in Chaney applies directly to agency decisions not to enforce a statute, we have also applied it to an agency’s decision to settle an enforcement action. In Schering Corporation v. Heckler, we considered a settlement agreement between FDA and TriBio, a drug manufacturer that marketed a drug without obtaining FDA approval. 779 F.2d 683 (D.C.Cir.1985). The agreement terminated pending litigation in which the parties disputed whether TriBio’s product could bypass the approval process because it was identical to a competitor’s product that was already on the market. Id. at 684-85. The parties agreed to dismiss the case, Tri-Bio agreed to pursue its claim before the agency instead of in the courts, and FDA agreed not to pursue further enforcement actions for 18 months. Id. at 685. Schering — the competitor whose drug was already approved — sued, claiming that the agreement was invalid insofar as it granted , a de facto approval of Tri-Bio’s drug. Id. We affirmed the district court’s ruling that FDA’s decision to terminate the litigation with a settlement agreement was unre-viewable under Chaney. Id. We held that FDA’s agreement not to sue for 18 months “merely postponed any decision with regard to enforcement until it has had an opportunity to determine whether” the drug was subject to the Federal Food, Drug, and Cosmetic Act (“FDCA”). Id.
The present matter falls squarely within these precedents. As in Schering, EPA has doubts about AFOs’ obligations under the Acts. See id. at 686-87 (holding that Chaney shields from judicial review the agency’s decision to resolve its doubts about Tri-Bio’s compliance with statutory requirements in an administrative rather than judicial forum). The Agreement is intended to save the time and cost of litigation while providing the agency with an opportunity to determine whether, and to what extent, AFOs are subject to the statutory requirements. Consent Agreement, 70 Fed.Reg. at 4958 (concluding that the Agreement “will help participating AFOs pool their resources to lower the cost of measuring emissions and ensure that they comply with all applicable environmental regulations in the shortest amount of time”). EPA could have pursued enforcement actions against each individual AFO, but determined that a broader strategy would lead to quicker industry-wide com *1032 pliance. Id.) July 12 Notice, 70 Fed.Reg. at 40,018. These judgments—arising from considerations of resource allocation, agency priorities, and costs of alternatives—are well within the agency’s expertise and discretion. See Chaney, 470 U.S. at 831-32, 105 S.Ct. 1649.
Chaney's, presumption of non-re-viewability only applies where the governing statute’s enforcement provision describes the agency’s role as discretionary. 470 U.S. at 835-37, 105 S.Ct. 1649; Schering, 779 F.2d at 686 (describing Chaney as holding that “an agency judgment relating to the exercise of its enforcement power presumptively lies beyond the reach of APA review as an action ‘committed to agency discretion by law[1] ”) (quoting 5 U.S.C. § 701(a)(2)). If, however, the governing statute removes the agency’s discretion not to enforce, then there is “law to apply” under APA § 701(a)(2) and the Chaney presumption is rebutted. Chaney, 470 U.S. at 834-35, 105 S.Ct. 1649. In Chaney, the FDCA’s enforcement provision stated that “the Secretary is authorized” to take certain enforcement actions and that violators “shall be liable to be proceeded against.” Id. at 835, 105 S.Ct. 1649 (quoting 21 U.S.C. §§ 372, 334). The Supreme Court held that these provisions “commit[ted] complete discretion to the Secretary to decide how and when they should be exercised.” Id.
In this case, the relevant statutes—the Clean Air Act, CERCLA and EPCRA—describe EPA’s authority in similarly permissive terms. The Clean Air Act, for example, states in the primary federal enforcement provision that “whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated, or is in violation of, any other requirement or prohibition of this sub-chapter ... the Administrator may ” take any number of enforcement actions, including issuing an administrative penalty order, issuing a compliance order, bringing a civil action, or requesting that the Attorney General bring a criminal action. 42 U.S.C. § 7413(a)(3) (emphasis added). CERCLA’s federal enforcement provision states in relevant part that the President “may” assess civil penalties, “may” bring a judicial action to assess and collect a penalty, and “may” grant rewards to facilitate prosecution of criminal violators. Id. § 9609(a)-(d). CERCLA provides that a class I or class II administrative penalty “may be assessed by the President in the case of any of the following,” and lists the CERCLA sections that are subject to each type of penalty. The President, therefore, is not bound to assess a given penalty for a given violation; rather, he merely has discretion to do so. The only limiting language appears in the subsection providing certain factors to determine the penalty amount, and limiting the dollar amount for each penalty; there is no limitation on the President’s ability to refrain from issuing a penalty or take other enforcement measures. Id. § 9609(a)(1), (a)(3), (b)-(c). The President has delegated his powers under this CERCLA subsection to the Administrator of EPA, except where the violation falls within the jurisdiction of other executive departments, agencies, or the Coast Guard. Exec. Order No. 12,580, 52 Fed.Reg. 2923, 2925-27 (Jan. 23, 1987).
Finally, EPCRA’s enforcement section provides that, for violations of the emergency planning and notification provisions, the Administrator “may” issue compliance orders, “may” assess administrative penalties, and “may” sue in court to assess and collect a penalty. 42 U.S.C. § 11045(a)-(e). The language limiting civil enforcement discretion only provides factors for arriving at a penalty amount. Id. § 11045(b)(1)(C). Violations of the reporting requirements are subject to a stricter *1033 standard, but it is not one that restricts EPA’s discretion as to how to enforce the statute. “Any person ... who violates” the reporting requirements “shall be liable to the United States for a civil penalty” in specified amounts, and each day such violations continue “shall ... constitute a separate violation.” Id. § 11045(c)(l)-(3). This language makes clear that the liability attaches immediately upon violation; but the statute goes on to state that “[t]he Administrator may assess any civil penalty for. which a person is liable under this subsection by administrative order or may bring an action to assess and collect the penalty” in court. Id. § 11045(c)(4). The Administrator thus retains discretion to decide whether and how to pursue the penalties that attach to violations.
None of the statutes’ enforcement provisions give any indication that violators must be pursued in every case, or that one particular enforcement strategy must be chosen over another. See Chaney, 470 U.S. at 885, 105 S.Ct. 1649. Rather, the Acts are “framed in the permissive.” Id. Decisions about whether and how to enforce the Acts against certain facilities are left to the discretion of the agency. See Schering, 779 F.2d at 687 (describing FDA’s decision to settle as a product of “precisely the sort of balancing of agency priorities and objectives, informed by judgments based on agency expertise, that, absent some ‘law to apply,’ should not be second-guessed by a court”). And the statutes provide no meaningful guidelines defining the limits of that discretion. See Chaney, 470 U.S. at 834-35, 105 S.Ct. 1649 (explaining that only when such standards are present may “courts ... require that the agency follow that law”). Petitioners have pointed us to no statutory language that rebuts the Chaney presumption that the Agreement, as a civil enforcement decision, is committed to the discretion of the agency.
We also reject petitioners’ argument that the Agreement is a rule. The APA defines a “rule” as “an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy.” 5 U.S.C. § 551(4). Petitioners argue that the Agreement is intended to “prescribe law” because it grants an exemption from the Acts for a specified period of time. We disagree. The Agreement merely defers enforcement of the statutory requirements, and makes that deferral subject to enforcement conditions that will ultimately result in compliance. An AFO that fails to fulfill specific obligations loses the protections of the Agreement, leaving EPA free to sue or take other enforcement actions against the AFO. A limited deferral subject to enforcement conditions works no change in the agency’s substantive interpretation or implementation of the Acts. As a result, it is not consistent with the cqncept of a “rule” as that term has been defined.
In National Association of Home Builders v. U.S. Army Corps of Engineers, the Corps issued nationwide permits that authorized certain discharges into U.S. waters — something that could not otherwise be done under the governing statute without first obtaining an individual permit. 417 F.3d 1272 (D.C.Cir.2005). This action effectively granted permittees the right to bypass certain requirements of the statute. Id. at 1279-80. In holding that the agency had in effect issued a rule, we described the nationwide permit as a “legal prescription ... which the Corps has issued to implement” the permitting provisions of the applicable statute. Id. at 1284. In another case relied on by petitioners, CropLife America v. EPA we held that EPA had promulgated a rule when it announced that the agency would no longer consider *1034 certain studies in its regulatory decision-making. 329 F.3d 876 (D.C.Cir.2003). These studies had long been submitted by applicants — and accepted by EPA — as evidence of a pesticide’s safety. Id. at 879-80. We rejected the agency’s argument that the statement was merely one of policy because it was “a firm rule with legal consequences that are binding on both petitioners and the agency.” Id. at 882. We also noted that petitioners would not have another opportunity to challenge the directive. Id.
Both Home Builders and CropLife address circumstances not present in the instant case. The AFOs’ Agreement with EPA does not express the agency’s implementation of any provision of the Clean Air Act, CERCLA or EPCRA. Rather, the Agreement implements a preliminary step — developing a reliable methodology— that the agency deems a prerequisite to enforcement of the Acts. The Agreement makes no determination of an AFO’s compliance with the Acts and makes no definitive statement of enforcement or interpretive practices that EPA will apply in its regulatory decisionmaking. See Int’l Union v. Brock, 783 F.2d 237, 245-46 (D.C.Cir.1986) (distinguishing an agency’s announcement of a new, substantive interpretation of the statute from those decisions that do not affect “underlying legal or factual issues”); cf. Edison Elec. Inst. v. EPA, 996 F.2d 326, 333 (D.C.Cir.1993) (describing the EPA’s interpretation of a statutory provision as having “to do with the substantive requirements of the law; it is not the type of discretionary judgment concerning the allocation of enforcement resources that Heckler [v. Chaney] shields from judicial review”).
More generally, in the Agreement EPA issues no statement with regard to substantive statutory standards. EPA has not bound itself in a way that reflects “cabining” of its prosecutorial discretion because it imposed no limit on its general enforcement discretion if the substantive statutory standards are violated. It is thus unlike Community Nutrition Institute v. Young, 818 F.2d 943, 948 (D.C.Cir.1987) (per curiam), a case in which we held that FDA’s announcement of action levels that specified when merchants would be subject to enforcement proceedings under the statute constituted a rule. That was so because “cabining of an agency’s prose-cutorial discretion can in fact rise to the level of a substantive, legislative rule” when it “is in purpose or likely effect one that narrowly limits administrative discretion.” Id. (internal quotation marks and citations omitted). In the instant case, EPA’s “cabining” of its ability to sue AFOs for a period of time is not based on a substantive interpretation of the statutes, but rather is a way to defer enforcement of those substantive interpretations until EPA has determined how their requirements apply in the particular case of AFOs. See Schering, 779 F.2d at 686 (concluding that the agreement in that case was “a paradigm case of enforcement discretion” because “the settlement agreement merely holds enforcement in abeyance until the agency can determine whether [the drug] is a product subject to the Act’s requirements”). Moreover, to the extent EPA has limited its enforcement discretion, it has done so only with regard to those AFOs who have signed Agreements. Were Community Nutrition Institute to apply to the agency’s decision to limit its enforcement discretion in individual cases, its reach would extend to nearly every consent agreement between an agency and a regulated entity. We do not read that case to have such broad effect.
It is of little consequence that the procedural posture of this case differs from *1035 Schering and similar cases. In those cases, litigation was pending at the time of settlement, whereas here EPA has not filed complaints against the AFOs. Settlement without any court record is not uncommon in administrative law, because the agency may attempt negotiation before proceeding to court. If the parties succeed in negotiating a mutually agreeable resolution to the violations, the matter will not end up in court. The lack of a complaint does not render inapplicable Chaney and Schering. The law as stated in those cases shields from judicial review EPA’s decision either to refrain from enforcement action or to settle pending litigation. Each decision implicates a number of factors bearing on the agency’s enforcement authority, including policy priorities, allocation of resources, and likelihood of success — and it is the agency’s evaluation of those factors that this court should not attempt to review. See Chaney, 470 U.S. at 831-32, 105 S.Ct. 1649 (“The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.”); Schering, 779 F.2d at 685-86 (discussing the Supreme Court’s “clear signal [in Chaney ] that such decisions by the FDA involve a complex balancing of an agency’s priorities, informed by judgments ‘peculiarly within its expertise,’ and that they are therefore ill-suited for judicial review”) (footnote omitted). The same factors are reflected in EPA’s decision to settle potential litigation by industry-wide agreements instead of individual complaints. EPA has noted that requiring an AFO to monitor itself and attain compliance on a case-by-case basis is “difficult and time consuming,” and thus EPA has concluded that the Agreement is the “quickest and most effective way” to achieve broad compliance. Consent Agreement, 70 Fed.Reg. at 4958; July 12 Notice, 70 Fed.Reg. at 40,018 (noting that EPA believes the approximately three and a half years needed to develop new methodologies “represents the most aggressive schedule that is reasonably possible”). We find no principled reason to treat EPA’s decision to secure compliance by settlement in lieu of litigation differently than its decision to initiate and subsequently settle litigation. Cf. N.Y. State Dep’t of Law v. FCC, 984 F.2d 1209, 1215 (D.C.Cir.1993) (“We can see no reason for the FCC to have less latitude in the early stages of an enforcement action than after its completion.”). As in Schering, “[w]e can no sooner question the soundness of th[e] bargain” to defer litigation in exchange for participation and funding of the study “than we could a unilateral agency decision not to prosecute ab initio.” 779 F.2d at 687.
We pause briefly to note that the questions left open by Chaney do not interfere with our conclusion today. Chaney excluded from its holding an agency’s decision not to pursue a violation where the agency “consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.” 470 U.S. at 833 n. 4, 105 S.Ct. 1649 (internal quotation marks and citation omitted). Here, however, there is no indication that EPA has abandoned its responsibility to enforce the Acts. Cf. Block v. SEC, 50 F.3d 1078, 1084 (D.C.Cir.1995) (rejecting an argument that the SEC, by granting exemptions, had abdicated its responsibility to enforce another subsection of the Act, largely because the agency used the exemption application process to informally achieve compliance). The covenant not to sue participating AFOs does not represent a policy that EPA will not enforce the Acts; to the contrary, it is part of the agency’s attempt to ensure that AFOs comply with the Acts. See id.; see also Schering, 779 F.2d at 687 (rejecting a description of the agreement *1036 not to prosecute for 18 months as a de facto determination of statutory requirements, and describing it as “simply represent[ing] the quid pro quo that the agency found necessary to procure Tri-Bio’s abandonment of its declaratory judgment claim”). Nor is there any concern in this case that EPA has declined to enforce the Acts because it falsely believes that it lacks jurisdiction, the other possible exception to the rule of Chaney. See Chaney, 470 U.S. at 833 n. 4, 105 S.Ct. 1649; see also id. at 839, 105 S.Ct. 1649 (Brennan, J., concurring).
B.
We also reject petitioners’ argument that the Agreement exceeds EPA’s authority under the Acts. As discussed supra Part II.A, the Acts’ enforcement provisions grant EPA broad enforcement authority and discretion, authorizing the agency to choose among various methods to penalize violators and achieve compliance. See 42 U.S.C. §§ 7413(a)(3), 7414(a)(1)(D), 9609, 11045. For example, the Clean Air Act’s primary enforcement provision provides, in relevant part:
Except for a requirement or prohibition enforceable under the preceding provisions of this subsection, whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated, or is in violation of, any other requirement or prohibition ... the Administrator may— (A) issue an administrative penalty order in accordance with subsection (d) of this section, (B) issue an order requiring such person to comply with such requirement or prohibition, (C) bring a civil action in accordance with subsection (b) of this section or section 7605 of this title, or (D) request the Attorney General to commence a criminal action in accordance with subsection (c) of this section.
42 U.S.C. § 7413(a)(3). EPA’s discretion in enforcing the Acts is apparent in the breadth of these enforcement options, as well as subsequent subsections that contain further grants of authority. For example, EPA may require a facility subject to the Clean Air Act to take actions to facilitate implementation of the Act or to determine whether the facility is in compliance. Id. § 7414(a). The agency may implement a field citation program to deal with minor violations, and may change a previously assessed penalty “with or without conditions.” Id. § 7413(d)(3), (d)(2)(B). CERCLA provides that a class I or class II administrative penalty “may be assessed by the President in the case of any” violations listed in the statute. Id. § 9609(a)(1), (b). Alternatively, it authorizes the President to seek judicial assessment of a penalty. Id. § 9609(c). EP-CRA’s enforcement provision contains similarly broad language with regard to violations of the emergency planning and notification requirements:
The Administrator may order a facility owner or operator ... to comply with section 11002(c) of this title and section 11003(d) of this title.... A civil penalty ... may be assessed by the Administrator in the case of a violation.... The Administrator may bring an action in the United States District Court for the appropriate district to assess and collect a penalty....
Id. § 11045(a)-(b). We also note that EPA’s regulations permit the agency to enforce the Acts by consent agreement and final order in lieu of filing a complaint. 40 C.F.R. § 22.13(b).
We read these enforcement provisions as broad grants of empowerment, not limitation. The authority bestowed on the agency sufficiently covers EPA’s actions in this case. EPA’s power to make decisions about whether and how to enforce the Acts *1037 reasonably contemplates the agency developing a plan for achieving compliance that it deems best suited to the industrial landscape and technological obstacles presented. Its ability to choose among numerous enforcement options in a particular case encompasses its decision that the best way to proceed in this case is by the Agreement.
III.
The Agreements do not constitute rule-making, but rather enforcement actions within EPA’s statutory authority. EPA’s exercises of its enforcement discretion are not reviewable by this court. The petitions for review are dismissed.

So ordered.

. Although petitioners’ standing was also challenged, this court is not bound to consider jurisdictional questions in any particular order. Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584-85, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999).

. AFOs who sign up will have to pay:
"[A] civil penalty which is based on the size of the AFO. The penalty ranges from $200 to $1,000 per AFO, depending upon the number of animals at the AFO.... The total penalty is capped and ranges from $10,000 for [a participant] having 10 or fewer farms to $100,000 for [a participant] having over 200 farms.”
Initial Notice, 70 Fed.Reg. at 4959. According to the Industry Intervenors, in the absence of the enforcement protocol, ‘‘potential civil penalties could run up to $32,500 per day per violation.” Brief of Intervenors for Respondents National Porlt Producers Council and Roe Farm, Inc. at 6 (citing Civil Monetary Penalty Inflation Adjustment Rule, 69 Fed.Reg. 7121, 7125-26 (Feb. 13, 2004)).